IN THE UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF TENNESSEE
KNOXVILLE DIVISION

| | |
|---|---|
| DEBBIE A. SAYLOR-SLOMBA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. 3:06-CV-175 |
| | ) |
| JO ANNE B. BARNHART, | ) |
| Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM OPINION

This is an action for judicial review, pursuant to 42 U.S.C. § 405(g), of defendant Commissioner's final decision denying plaintiff's claims for Supplemental Security Income ("SSI") benefits under Title XVI of the Social Security Act. For the reasons set forth herein, defendant's motion for summary judgment [doc. 17] will be granted, and plaintiff's motion for summary judgment [doc. 15] will be denied. The final decision of the Commissioner will be affirmed.

I.

*Procedural History*

Plaintiff applied for SSI in April 2003, claiming to be disabled by depression, anxiety, fatigue, and back pain. [Tr. 71, 76]. She previously applied for SSI benefits in

2002, and also in the 1990s while residing in Michigan.[1]

In her present application, plaintiff alleged a disability onset date of April 10, 2003. [Tr. 71]. The claim was denied initially and on reconsideration. Plaintiff then requested a hearing, which took place before an Administrative Law Judge ("ALJ") on July 22, 2004, and February 24, 2005.

On March 24, 2005, the ALJ issued a decision denying benefits. Citing a dearth of supporting objective evidence, credibility issues including "the intentional design to secure Xanax . . . from several different sources," and subjective complaints that are "mostly total fabrication," the ALJ determined at step two of the sequential evaluation process that plaintiff has no "severe impairment which is credibly established by signs, symptoms, laboratory findings or other evidence." [Tr. 20, 22, 25-26].[2] Plaintiff was therefore found ineligible for SSI benefits.

Plaintiff then sought review from the Commissioner's Appeals Council. On April 13, 2006, review was denied, notwithstanding plaintiff's submission of more than forty

---

[1] Plaintiff's 2002 application was denied and not appealed. [Tr. 44]. The 1990s application purportedly resulted in an award of SSI benefits based on "nerves and depression." [Tr. 384, 386]. Plaintiff states that the Commissioner subsequently discontinued those benefits due to excess family resources. [Tr. 384]. The court does not now have before it the administrative record considered in either prior filing. Undoubtedly, though, those records would pertain to a different *period* of time and would be of dubious relevance to the *period* now at issue.

[2] The ALJ who denied plaintiff's 2002 claim did, however, find that plaintiff was "severely" impaired at step two by "chronic fatigue syndrome secondary to Epstein Barr Syndrome" and by depression. [Tr. 49].

pages of additional medical records. [Tr. 8, 11].³ The ALJ's ruling therefore became the Commissioner's final decision. *See* 20 C.F.R. § 416.1481. Through her timely complaint, plaintiff has properly brought her case before this court for review. *See* 42 U.S.C. § 405(g).

II.

*Background and Testimony*

Plaintiff was born in 1960 and has a high school diploma. [Tr. 71, 383]. Her last reported employment was more than ten years ago, working "for a little while" as a school cafeteria monitor for two to six hours per week. [Tr. 77, 86-87, 211].

Plaintiff claims disabling back, leg, and hip pain from "that degenerative disc disease." [Tr. 385-86]. She alleges "real bad" arthritis in her shoulders. [Tr. 397]. She is able to perform light housework, but doing so purportedly makes her "really, really tired . . . very tired and weak from my chronic fatigue." [Tr. 97, 388].⁴ Plaintiff is also able to cook,

---

³ Plaintiff's additional documents are discussed in her brief and are included in the administrative record. [Tr. 334-379]. This court can remand a case for further administrative proceedings where a claimant shows that late-submitted evidence meets each prong of the "new, material, and good cause" standard of sentence six, 42 U.S.C. § 405(g). Plaintiff, however, has made no effort to articulate how her evidence warrants sentence six remand, nor has she even cited sentence six. The issue is accordingly waived. *Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1233 (6th Cir. 1993) ("Plaintiff has not only failed to make a showing of good cause, but also has failed to even cite this relevant section or argue a remand is appropriate."); *McPherson v. Kelsey*, 125 F.3d 989, 995 (6th Cir. 1997) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.") (citation omitted). Accordingly, plaintiff's additional medical evidence [Tr. 334-79] has *not* been considered by this court.

⁴ Plaintiff refers to her purported condition as chronic fatigue syndrome and as Epstein-Barr syndrome. [Tr. 397]. She claims to have been diagnosed with Epstein-Barr, following testing and hospitalization, while a resident of Michigan. [Tr. 392-93]. The initial diagnosis was allegedly in 1999 by a Michigan gynecologist named "Mrs. Atchoo." [Tr. 124]. The administrative record,
(continued...)

3

drive, home-school her children, and attend church every Sunday evening, but she allegedly needs assistance from her children when shopping if "the grocery cart . . . gets to [sic] heavy." [Tr. 96-97, 286, 288, 389, 395].

Plaintiff also complains of disabling depression and "real bad panic attacks," for which she takes Xanax. [Tr. 389-90]. She claims to have undergone psychiatric care in both Michigan and Tennessee, but is presently being "treated" for her alleged mental illness by her "family doctor" Luis Pannocchia, who merely supplies her with regular Xanax prescriptions. [Tr. 389-91]. Plaintiff's alleged daily panic attacks purportedly cause breathing problems, "heart palpitations," and reddening of the face. [Tr. 393-94].

### III.

*Relevant Medical Evidence and Opinions*

#### A. Physical

Plaintiff has been regularly treated by Dr. Pannocchia since June 2002 for gynecological complaints, cold-like symptoms, allergies, and Xanax "medication management." The handwritten notes of Dr. Pannochia contain no detectible mention of pain following plaintiff's first eight appointments. In February through April 2003, plaintiff briefly complained of left leg pain [Tr. 171, 173, 175], but that issue is not mentioned in the doctor's treatment notes for the following nine appointments. Further, although plaintiff

---

[4](...continued)
however, contains no treatment records from a "Mrs. Atchoo," nor from other purported Michigan physicians Suchan, Steinman, Benton, Yezbick, Tanswai, or Dawud. [Tr. 124-25].

alleges that a multivitamin prescription constitutes treatment of chronic fatigue syndrome by Dr. Pannocchia [Tr. 310], that doctor's notes (covering at least twenty-two appointments) do not reference *chronic* fatigue at all.[5]

In June 2003, plaintiff underwent a physical consultative examination by Dr. Joseph Johnson in association with the present SSI claim. Despite apparently having never previously complained of either condition to treating physician Pannocchia, plaintiff told Dr. Johnson that "[h]er low back hurts about 75% of the time. . . . She has fatigue at all times which she rates at 10 out of 10." [Tr. 214]. After examination, Dr. Johnson summarized that "[r]egarding back pain: She has near normal range of motion of the back as above. Her main limitation as far as employment is her chronic fatigue [based on the] history she gives me." [Tr. 215].

Following complaints of low back pain secondary to a fall, June 2004 spinal x-rays showed "good bony formation. . . . [but] some early degenerative changes in the mid-thoracic area." [Tr. 314, 317]. Although plaintiff's complaints were "secondary to a fall 4 months ago at home," Dr. Pannocchia termed the x-ray findings "degenerative disc disease." [Tr. 312, 314].

---

[5] On April 25, 2003, plaintiff complained of fatigue associated with a sinus infection. [Tr. 169]. On June 21, 2004 (fourteen months after the alleged onset of disability), plaintiff complained that "[f]or the past several months she has been feeling weak, tired and fatigued with no energy." [Tr. 314].

5

B. Mental/Pharmaceutical

At her initial appointment with Dr. Pannocchia's office in June 2002, plaintiff reported that she had received prescriptions for Xanax and sleeping pills from a doctor "in Michigan." [Tr. 191]. Because plaintiff complained of anxiety and insomnia, the prescriptions were continued. [Tr. 189-90]. At a November 2002 appointment, plaintiff was noted to be "very upset and nervous . . . almost hysterical," but Dr. Pannocchia's office related the problem to plaintiff's divorce and "fe[lt] like this situation will be worked out." [Tr. 181]. At her next appointment, Dr. Pannocchia noted that "Xanax has been working well." [Tr. 179].

At a June 2002 initial evaluation by Cherokee Health Systems ("Cherokee"), plaintiff reported depression and anxiety for which she takes Xanax. [Tr. 205]. At her initial psychiatric evaluation two months later, plaintiff reported anxiety, depression, and "Chronic Fatigue." [Tr. 203-04] (quotations in original). The evaluating clinician counseled plaintiff to reduce her Xanax usage, but plaintiff was described as "resistant" both to that suggestion and to the notion of participating in therapy. [Tr. 204]. Plaintiff stated instead that Xanax "is [the] only thing that helps her." [Tr. 203]. The clinician diagnosed anxiety, depression, possible Xanax dependency, and possible malingering. [Tr. 204].[6] Diagnoses of possible

---

[6] Despite diagnoses of possible drug addiction and malingering, and seemingly unaware that plaintiff was already receiving Xanax prescriptions from Dr. Pannocchia's office, Cherokee *also* provided a prescription for Xanax. [Tr.198, 276]. Curiously, plaintiff chose to have her Cherokee Xanax prescription filled at a different pharmacy than the one which regularly filled her Pannocchia Xanax supply. [Tr. 276-83].

malingering and drug addiction were repeated following a Cherokee "medication evaluation" one month later, although the clinician recorded that plaintiff was "surprisingly . . . easily agreeable" to a reduction in her Xanax prescription. [Tr. 201-02].[7]

"[A]fter a lapse of about six months," plaintiff appeared on May 7, 2003, for another appointment at Cherokee. [Tr. 198]. She told Dr. Bilal Ahmed that "[s]he has not been taking any medication, reportedly, for the last four to four-and-one-half months, since her medicines ran out, as prescribed by [Cherokee]. She does not have any primary health care provider." [Tr. 198]. These statements were patently false, because: (a) *plaintiff did have primary health provider at that time (Dr. Pannocchia)* [Tr. 167-79]; (b) **Dr. Pannocchia had regularly been prescribing Xanax during the prior four months** [Tr. 171, 176, 179]; and (c) *__plaintiff had in fact been regularly filling those prescriptions during the prior four months__* [Tr. 280-81].[8] Dr. Ahmed further noted that

> she was unable to give a coherent account of her symptoms currently, apart from the fact that she is very nervous and undergoing a very traumatic divorce
> . . . .
>
> . . . comfortably seated without any evidence of psychic or methodic anxiety. Coherent in thought process, though she is quite evasive about the description of her symptoms. Apart from the general statement about being nervous and at times sad and under a lot of stress because of her divorce, was not able to provide any spontaneous description of her problem. She tends to use labels

---

[7] As noted by the ALJ [Tr. 21], this seemingly "surprising" change in attitude may be explained by the fact that plaintiff had by this time obtained a regular parallel supply of Xanax from Dr. Pannocchia's office.

[8] The court observes that approximately two months prior to plaintiff's reappearance at Cherokee, Dr. Pannocchia wrote that "I am going to start decreasing her Xanax." [Tr. 175].

7

rather than explanation of feelings, like "I have generalized anxiety, panic disorder, major depression, though currently I am having more of panic and generalized anxiety." . . . . She is alert and oriented in three spheres. She is able to concentrate and focus on the conversation. There is no evidence of sleep deprivation. Speech is clear and conversational.

[Tr. 198].

The following month, in June 2003, clinical psychologist Roy Nevils performed a mental status evaluation. Plaintiff reported a history of depression, which is helped only by "prayer . . . [and] my Christian tapes." [Tr. 208]. Plaintiff also reported a history of anxiety and panic attacks. [Tr. 209] When twice asked how frequently she experiences panic attacks, plaintiff answered "All the time" and "Every day." [Tr. 209]. When asked if she had suffered a panic attack that day, plaintiff answered "Maybe." [Tr. 209]. Dr. Nevils observed, "There was no obvious physical . . . discomfort noted. She was mildly tense but pleasant . . . cooperative, spontaneous, coherent and without evidence of disorientation or thought disorder." [Tr. 209]. Dr. Nevils predicted that plaintiff "could have mild to moderate problems with memory and concentration." [Tr. 212].[9]

In October 2003, psychologist Robert Spangler performed a second mental status evaluation. Dr. Spangler observed "no indications of malingering." [Tr. 242].[10] Citing panic attacks, depression, and moderately erratic concentration, Dr. Spangler predicted that

---

[9] State agency physician Frank Kupstas then reviewed Dr. Nevils's evaluation and predicted that plaintiff would be moderately limited in eight categories. [Tr. 227, 233-34].

[10] The court notes in passing that this conclusion by Dr. Spangler is identical to that reached by him in most prior cases in which he has appeared as a consulting examiner before this court, despite generally overwhelming evidence to the contrary.

8

plaintiff would be vocationally limited in her persistence, adaptation, concentration, and social interaction. [Tr. 243-44].[11]

After a nearly fourteen month hiatus, and approximately one month prior to her first administrative hearing, plaintiff again resurfaced for evaluation at Cherokee. Presented with plaintiff's standard recitation of subjective complaints, Dr. Ahmed noted that she was "very vague in description [and without] further elaboration of these symptoms despite closed-ended questioning, which led to my inquiry about her previous psychiatric history." [Tr. 285]. Plaintiff responded by claiming a ten to twelve year history of treatment in Michigan by a psychiatrist and a primary care physician. [Tr. 285]. According to Dr. Ahmed, however, plaintiff refused "to provide us release of information to obtain the records from those physicians[.]" [Tr. 285]. Instead, she would only offer the purported doctors' purported names - Greenban and Yasbeck. [Tr. 285].[12] Although she was still receiving and filling Xanax prescriptions from Dr. Pannocchia [Tr. 275, 325], plaintiff "stated that, 'I know that you don't prescribe Xanax, but I want some help.'" [Tr. 285].[13] Dr. Ahmed described plaintiff as anxious, needy, coherent, pleasant, and "want[ing] a solution in medications . . . with an element of magical expectation[.]" [Tr. 286-87].

---

[11] State agency physician George Livingston then reviewed Dr. Spangler's evaluation and predicted that plaintiff would be moderately limited in eleven categories. [Tr. 255, 261-62].

[12] The alleged psychiatrist's name, "Greenban," does not remotely resemble a name on the list of past doctors provided to the Commissioner by plaintiff. *See* fn. 4.

[13] The administrative record reflects that Dr. Ahmed in fact did *not* give plaintiff a Xanax prescription, nor did she return for follow-up counseling despite her alleged desire for help.

9

A third mental status evaluation was performed by psychologist Kathryn Smith on September 13, 2004 (between plaintiff's first and second administrative hearings, as ordered by the ALJ). In addition to recording plaintiff's myriad subjective complaints, Dr. Smith administered intelligence and personality testing which caused plaintiff to be "very annoyed." [Tr. 295, 297]. Dr. Smith considered plaintiff a seemingly "credible informant regarding her performance during the interview." [Tr. 295]. Because plaintiff "said last night she slept only three hours and was really out of it" [Tr. 298], Dr. Smith opined that "IQ test scores are not considered valid due to the effects of sleep depravation, poor concentration and chronic poor motivation on test taking." [Tr. 295].[14]

Although plaintiff "claim[ed] to be forgetful," Dr. Smith noted that "[m]emory appears to be basically intact." [Tr. 297]. Plaintiff's "thinking was organized and logical" but "[s]he report[ed] a very serious problem with concentration," which Dr. Smith "observed" in part because plaintiff "said she was feeling tired." [Tr. 297].[15] Dr. Smith ultimately assessed serious limitations in twelve vocational categories, based on anxiety, depression, borderline intelligence, personality disorder, "and chronic poor motivation." [Tr.

---

[14] "Ms. Slomba did not seem to put forth adequate effort. She was not necessarily malingering, but she had poor concentration and had been sleep deprived *which she emphasized*, and she also seems to have chronic, very poor, motivation." [Tr. 301] (emphasis added). Plaintiff cites no authority to support the proposition that a worker's "chronic poor motivation" is grounds for an award of disability benefits.

[15] The ALJ deemed Dr. Smith's report "more consistent with an exercise in apologetics than a psychological evaluation . . . [containing only] one valid assessment as she noted the claimant showed little or no motivation." [Tr. 24, 26].

303, 305-06].[16]

Two weeks prior to her second administrative hearing, plaintiff again presented for an initial interview at Cherokee. She again reported anxiety, depression, and chronic fatigue. [Tr. 320].

IV.

*Expert Testimony*

Bill Ellis offered vocational expert testimony at plaintiff's second administrative hearing. Clinical psychologist Thomas Edward Schacht ("Dr. Schacht" or "MA") testified as a medical advisor. Dr. Schacht's testimony will be discussed below.[17]

V.

*Applicable Legal Standards*

This court's review is limited to determining whether there is substantial evidence in the record to support the ALJ's decision. 42 U.S.C. § 405(g); *Richardson v. Sec'y of Health & Human Servs.*, 735 F.2d 962, 963 (6th Cir. 1984). "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Perales*, 402 U.S. at 401 (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197,

---

[16] Although Dr. Smith diagnosed borderline intelligence, plaintiff graduated 179th out of a high school class of 415 students. [Tr. 308].

[17] An ALJ "is a layman; the medical adviser is a board-certified specialist. He is used primarily in complex cases for explanation of medical problems in terms understandable to the layman-examiner. He is a neutral adviser. . . . We see nothing unconstitutional or improper in the medical adviser concept[.]" *Richardson v. Perales*, 402 U.S. 389, 408 (1971).

229 (1938)). The "substantiality of evidence must take into account whatever in the record fairly detracts from its weight." *Beavers v. Sec'y of Health, Educ. & Welfare*, 577 F.2d 383, 387 (6th Cir. 1978) (quoting *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 488 (1951)). In reviewing administrative decisions, the court must take care not to "abdicate [its] conventional judicial function," despite the narrow scope of review. *Universal Camera*, 340 U.S. at 490.

An individual is eligible for SSI benefits on the basis of financial need and either age, blindness, or disability. *See* 42 U.S.C. § 1382(a). "Disability" is the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A).

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 1382c(a)(3)(B). Disability is evaluated pursuant to a five-step analysis summarized as follows:

1. If claimant is doing substantial gainful activity, he is not disabled.

2. If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3. If claimant is not doing substantial gainful activity and is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

4. If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5. Even if claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that accommodates his residual functional capacity and vocational factors (age, education, skills, etc.), he is not disabled.

*Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997) (citing 20 C.F.R. § 404.1520). Plaintiffs bear the burden of proof at the first four steps. *Walters*, 127 F.3d at 529. The burden shifts to the Commissioner at step five. *Id.*

VI.

*Analysis*

Plaintiff argues that the ALJ "rejected every medical opinion of record" in concluding that she has no severe impairment. According to plaintiff, the ALJ "played doctor" and "substituted his own layman's opinion" for those of numerous medical sources. Plaintiff further contends that the present ALJ was bound, under the principle of *res judicata*, by the prior ALJ's conclusion "that Ms. Slomba has the following severe combination of impairments to satisfy the threshold [step two] showing: chronic fatigue syndrome secondary to Epstein Barr Syndrome, and . . . depression." [Tr. 45].

## A. Step Two "Severity"

The ALJ found, at step two of his sequential analysis, that plaintiff "does not have a severe impairment which is *credibly* established by signs, symptoms, laboratory findings or other evidence." [Tr. 20] (emphasis added). The "severe" impairment threshold of step two is a "*de minimis* hurdle," but may nonetheless be "employed as an administrative convenience to screen out claims that are 'totally groundless' solely from a medical standpoint." *Higgs v. Bowen*, 880 F.2d 860, 862-63 (6th Cir. 1988) (citation omitted). "Congress has approved the threshold dismissal of claims obviously lacking medical merit, because in such cases the medical evidence demonstrates no reason to consider age, education, and experience" at steps four and five. *Id.*

A claimant fails at step two if she does not demonstrate an "impairment or combination of impairments which significantly limits [her] physical or mental ability to do basic work activities[.]" 20 C.F.R. § 416.920(c). Stated in the reverse, an applicant should be rejected at step two only if the alleged impairment is a "slight abnormality which has such a minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education, and work experience." *Farris v. Sec'y of Health & Human Servs.*, 773 F.2d 85, 90 (6th Cir. 1985) (citation omitted). This severity threshold "increases the efficiency and reliability of the evaluation process by identifying at an early stage those claimants whose medical impairments are so slight that it is unlikely they would be found to be disabled even if their age, education, and experience

were taken into account." *Bowen v. Yuckert*, 482 U.S. 137, 153 (1987).

Review of the present ALJ's decision makes clear that he did not "play doctor" but rather relied upon the synthesizing testimony of medical advisor, and clinical psychologist, Dr. Schacht. Again, the Supreme Court has found the use of medical advisor testimony to be neither unconstitutional nor improper. *Richardson v. Perales*, 402 U.S. 389, 408 (1971). While the ALJ is in fact normally "a layman[,] the medical adviser is a board-certified specialist. He is used primarily in complex cases for explanation of medical problems in terms understandable to the layman-examiner. He is a neutral adviser." *Id.*

In the present case, Dr. Schacht offered comprehensive and thorough testimony based on his review of the entire medical record. His testimony, as relied upon by the ALJ, is summarized as follows:

> 1. The record indicates drug-seeking behavior and possible malingering. [Tr. 407-08]. In addition to the 2002 Cherokee diagnosis of possible malingering, plaintiff's "L" score on the MMPI administered by Dr. Smith was also probative. Dr. Schacht testified that "there are multiple different ways that a person can make an inaccurate presentation. . . . An alternative way to make an inaccurate presentation is to exaggerate one's virtue and believability. . . . And the L scale here would be more consistent with that form of inaccuracy." [Tr. 414].
>
> 2. Plaintiff's self-report of panic attacks is questionable, as illustrated by her statement on June 3, 2003, that she "maybe" had an attack earlier that day. Dr. Schacht testified, "Individuals who have panic attacks don't typically have doubt as to whether or not they have them. It's not a subtle experience." [Tr. 411].
>
> 3. As to the allegedly impaired concentration observed by Dr. Smith, plaintiff's ability to complete all items on the 567-question MMPI evidences that her concentration is in fact not severely impaired. [Tr. 416-17].

15

> 4. Dr. Schacht could not extrapolate any serious psychological impairment from his review of plaintiff's administrative record. [Tr. 406, 415].

The court finds the ALJ's decision to be supported by substantial evidence. The ALJ cited plaintiff's "evasive" conduct, her "patently false" statements, and her possible drug-seeking and malingering as evidence that her subjective complaints cannot be credited. The ALJ correctly noted that the limitations predicted by the consulting mental health sources are almost entirely based on plaintiff's self-reporting and are thus unreliable. Further, the MA's opinions were based on a review of plaintiff's entire file, whereas the individual sources lacked access to, in the words of the ALJ, an "understanding of the significant duplicity contained in the record extant." [Tr. 26]. *See Atterberry v. Sec'y of Health & Human Servs.*, 871 F.2d 567, 570 (6th Cir. 1989) (approving of reliance on "complete and detailed" MA testimony).

Substantial evidence also supports the ALJ's finding of no "severe" physical impairment resulting from either back pain or chronic fatigue syndrome in light of "the paucity of complaints to her treating physician" regarding these conditions. [Tr. 26]. As discussed above, there is no reference to chronic fatigue syndrome in Dr. Pannocchia's records, even though plaintiff has been treated by that physician's office more than twenty times. Although Dr. Pannocchia did note "degenerative disc disease" more than a year after plaintiff's alleged disability onset date, the x-ray summary supporting that notation mentions only "some early degenerative changes." [Tr. 317]. By plaintiff's own report, the associated pain was episodic secondary to a fall [Tr. 314], Dr. Pannocchia offered no opinion that the

condition would affect her ability to work, and examining physician Johnson considered her prior back complaints but predicted no limitations. [Tr. 215].

Plaintiff misapprehends the nature of substantial evidence review. A decision of the Commissioner is not subject to reversal merely because a reasonable mind could have reached the opposite conclusion. *See, e.g., Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997). Certainly, a fact-finder could have credited plaintiff's subjective complaints and/or the conclusions of the consulting sources. However, a fact-finder could also have reasonably rejected both based on the present record. The substantial evidence standard of review permits that "zone of choice." *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986). Further,

> after listening to what [plaintiff] said on the witness stand, observing [her] demeanor, and evaluating that testimony in light of what appears in the written medical records, the ALJ concluded, rightly or wrongly, that [plaintiff] was trying to make [her] symptoms and functional limitations sound more severe than they actually were. It is the ALJ's job to make precisely that kind of judgment. It is a difficult job, and the people who perform it sometimes err. Such errors are obviously difficult for a reviewing court to detect (the reviewing court not having seen the claimant in the flesh), and we will not normally substitute our impressions on the veracity of a witness for those of the trier of fact. ***We would be particularly reluctant to do so in this case, where there seem to be demonstrable discrepancies between what the claimant said on the stand and what the written record shows***.

*Gooch v. Sec'y of Health & Human Servs.*, 833 F.2d 589, 592 (6th Cir. 1987) (emphasis added).

The present claimant personifies the circumstance described in *Gooch*. Where a record contains myriad discrepancies (or, as in this case, blatant falsities), it at some point becomes impossible for the fact-finder (be that the undersigned or an ALJ) to completely

17

separate truth from fiction. The present plaintiff must accept that consequence as the outcome of her own conduct.

B. *Drummond*

Lastly, plaintiff argues that because a prior ALJ found her to be severely impaired by chronic fatigue syndrome and depression, the principle of *res judicata* mandates the same result thereafter. "Just as a social security claimant is barred from relitigating an issue that has been previously determined, so is the Commissioner. . . . When the Commissioner has made a final decision concerning a claimant's entitlement to benefits, the Commissioner is bound by this determination absent changed circumstances." *Drummond v. Comm'r of Soc. Sec.*, 126 F.3d 837, 842 (6th Cir. 1997).

*Res judicata* does not apply in this case. As noted by the present ALJ, before him were "numerous records not available to the previous ALJ." [Tr. 26]. That evidence, including Dr. Schacht's testimony, cumulatively supports the conclusion that plaintiff's subjective complaints (including depression and chronic fatigue) range between dubious and patently false. Where there is new and material evidence pertaining to a claimant's condition, a subsequent ALJ is *not* bound by the findings of a previous ALJ. *Drummond*, 126 F.3d at 842.

C. Conclusion

The ALJ correctly identified plaintiff, "at an early stage[, as a] claimant[] whose medical impairments are so slight that it is unlikely [she] would be found to be

disabled even if [her] age, education, and experience were taken into account." *Yuckert*, 482 U.S. at 153. That decision will be affirmed, and an order consistent with this opinion will be entered.

ENTER:

       s/ Leon Jordan       
United States District Judge